```
 1    STATE OF ILLINOIS    )
                           )  SS:
 2    COUNTY OF C O O K    )

 3        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

 4            COUNTY DEPARTMENT - CRIMINAL DIVISION

 5    THE PEOPLE OF THE          )
      STATE OF ILLINOIS          )
 6                               )
              vs.                )  No. 14 CR 16367
 7                               )
      GLENN EVANS                )
 8

 9                REPORT OF PROCEEDINGS at the trial of

10    the above-entitled cause, had before the HONORABLE

11    DIANE GORDON CANNON on the 14th day of December 2015.

12
      A P P E A R A N C E S:
13
              HON. ANITA M. ALVAREZ
14            STATE'S ATTORNEY OF COOK COUNTY
              BY:  MS. LAUREN FREEMAN
15                 MS. AMY WATROBA
                   MR. FRANK LAMAS
16                 Assistant State's Attorneys
                   Appeared on behalf of the People;
17
              MS. LAURA MORASK
18            MR. DEAN MORASK
              MR. TIMOTHY BLACK
19                 Appeared on behalf of the Defendant.

20

21

22    JO ANN KROLICKI, CSR
      Official Court Reporter
23    Illinois License No. 084-002215

24
```

```
1                THE CLERK:  People versus Glenn Evans.
2                MS. MORASK:  Stepping up.
3                THE COURT:  All right.  Defendant is
4    present with counsel.
5                MS. MORASK:  Yes.
6                THE COURT:  And defense is present.  State
7    is present.
8                Could we have your names for the
9    record, please?
10               MS. MORASK:  Laura Morask, M-o-r-a-s-k,
11   along with Dean Morask, M-o-r-a-s-k, and Tim Black,
12   B-l-a-c-k, on behalf of my client, Glenn Evans.
13               THE COURT:  Okay.
14               MS. FREEMAN:  Good morning, Judge.
15               THE COURT:  Good morning.
16               MS. FREEMAN:  Lauren Freeman,
17   F-r-e-e-m-a-n, Amy Watroba, W-a-t-r-o-b-a, and Frank
18   Lamas, L-a-m-a-s, on behalf of the People.
19               THE COURT:  The case is up for a ruling.
20   You may be seated.
21               Having heard the testimony in the
22   case of People of the State of Illinois versus Glenn
23   Evans, charged with aggravated battery and official
24   misconduct, which the Court heard over three days,
```

1  the Court makes the following findings of fact and
2  conclusions of law:
3              Rickey Williams testified on June
4  30th, 2013, in the late afternoon, he was standing on
5  the south side of Chicago at a bus stop, 71st and
6  Eberhart.  He was with three male blacks, one named
7  Tank.  The other two males he did not know.
8              He had his cellphone out when a
9  Crown Victoria pulled up and an officer gazed at him.
10 He thought the officer first was in plain clothes,
11 then testified he was in uniform.
12             Rickey Williams ran about three
13 blocks into an abandoned building.  He testified he
14 ran because he was nervous because the officer might
15 have thought he was selling marijuana, which he had
16 done previously.
17             He ran with his cellphone in his hand
18 quickly into the basement of a house that was
19 abandoned, dark, no lights.  He then ran up the
20 stairs into a closet in the kitchen.  He ran into a
21 closet that had shelves and no door.  He testified he
22 crouched down and lit a cigarette.
23             The first thing he remembers was
24 lights flashing everywhere and one officer came in

1   with a flashlight and said, here he goes, we got him.
2   The officer grabbed him by the neck and threw him to
3   the ground.
4               First, Rickey Williams testified he
5   never had seen this officer before, then stated he
6   was the officer he saw in the Crown Vic, black
7   African American.
8               He threw him to the ground face
9   first, and then another officer punched his head into
10  the ground lightly.  The black officer then put his
11  knee in his side and took out his weapon and shoved
12  it down his throat, then took his taser, and put it
13  to his groin.  He now remembers the gun was in his
14  left hand and taser in his right.
15              Rickey Williams' hands were straight
16  up above his head as he demonstrated, no handcuffs on
17  when the officer put his weapon down his throat and
18  taser to his groin.  Rickey Williams never tried to
19  stop the officer, touch the gun or taser.
20              Another officer showed him a bullet
21  and said they were going to charge him with that and
22  get him a million dollar bond and he had -- and say
23  that he had 25,000 grams of cannabis on him.  Rickey
24  Williams -- that officer at various times was

1  Commander Evans, a male Hispanic, and a male white.
2           Rickey Williams was taken to the 3rd
3  District. He testified he complained to the lockup
4  keeper about being beaten.
5           He was charged with disorderly
6  conduct for running with a gun that wasn't recovered.
7  He bonded out the next day by his girlfriend -- with
8  his girlfriend, and he did not seek medical
9  attention.
10          This is not a good time for police
11 misconduct. A lot of people have said that. It's
12 not a good time to try a case like this. I say to
13 you, it's never a good time to have a police
14 misconduct case.
15          If these allegations are, indeed,
16 true, it would not only shake our confidence in law
17 enforcement, these horrific allegations combined with
18 the recent law enforcement activity, positive DNA,
19 have led Rickey Williams to shout out in this
20 courtroom, he wants five million dollars.
21          Accordingly, the evidence taken the
22 days following the incident and the day of the
23 incident and the years following must be examined.
24          The inconsistencies in Rickey

1  Williams' testimony date back to the day after this
2  happened and continued for years and at the trial.
3  He gave a different version of events in either each
4  line of his testimony, from one line to the next, or
5  on cross-examination, or to IPRA initially, or to
6  IPRA in the days following, or to investigators at
7  Pontiac, or to the State's Attorney's Office.  His
8  testimony taxes the gullibility of the credulous.
9              The description of the offending
10 officers to IPRA the day after this -- his arrest was
11 a male, white Hispanic.  Commander Evans is a male
12 black.  He spelled out the officer who punched him
13 and beat him inside the house, T-o-d-d,
14 M-u-e-l-l-e-r.
15             Officer Mueller never entered the
16 house or touched Rickey Williams.  His name, however,
17 did appear and was typed by him on an inventory sheet
18 that he gave to Rickey Williams.
19             Rickey Williams said in court
20 Commander Evans took his gun out after he grabbed
21 him.  As Officer Bratton testified and commonsense
22 dictates, Commander Evans and others were chasing a
23 man with a gun into an abandoned building.  They all
24 had their guns drawn.

1       Rickey Williams said the closet he
2  hid in had no door.  The closet clearly shows a door
3  in People's Exhibit 11.  The door was closed at least
4  partially, which is why Commander Evans walked by him
5  and Officer Bratton saw him.
6       Rickey Williams said there were
7  flashlights all around.  He could certainly tell the
8  difference between a bullet and a shell casing.
9  Rickey Williams insists that the gun was all black,
10 no silver.  Commander Evans' gun is silver; albeit,
11 it has a black handle or black grip.
12      Rickey Williams said he couldn't
13 identify faces from photographs, which is why he did
14 not pick anyone from the photo array out at Pontiac.
15 He did, however, pick out five officers, according to
16 Martrice Campbell, who, as the state pointed out, has
17 no reason to lie, not just as being familiar faces,
18 but he assigned them specific spots during his
19 ordeal, inside the house, outside the house, never
20 inside, never outside.  Some of those who he
21 identified after being told there is no need to pick
22 out someone if he was not sure were fillers.
23      Rickey Williams never identified
24 Commander Evans except by name, which according to

```
 1    him he got from the internet with his girlfriend, who
 2    used to be a friend of the Commander's.
 3                    Rickey Williams testified the
 4    officers in the house referred to Commander Evans as
 5    300 in the house.  Officer Bratton said, absolutely
 6    not.  Not only was it not said, that would be
 7    disrespectful to call someone by their beat number.
 8    No one said, 300 in the house.
 9                    And I think anyone who has done
10    criminal cases has never heard someone referred to as
11    1321 or, hello there, 1416.
12                    Rickey Williams described his
13    cellphone as being smashed against a wall inside the
14    house.  He later testified the same cellphone was
15    given to his girlfriend and was, indeed, a working
16    phone because he used it.
17                    Rickey Williams described the abuse
18    as punching, pounding into the ground, his face down,
19    and then he was turned over and abuse continued.
20                    The testimony to IPRA was a beating.
21    On cross-examination, the abuse -- on
22    cross-examination at trial, there was a light
23    tapping.
24                    People's Exhibits 1 and 2, along with
```

```
 1    the kitchen photographs, make either scenario
 2    impossible.  Impossible to have been punched,
 3    impossible to have taken any punching to take place
 4    face down in that kitchen.  Rickey Williams does not
 5    have a mark on his face, his mouth, his body.
 6              Equally as unlikely are the photos of
 7    his clothing.  White arms on his jacket still appear
 8    pure white.  Black pants, no dirt, not a speck.  Both
 9    pristine.  And he was in the same clothing according
10    to him three days later.  Physical evidence that
11    contradicts his testimony.
12              Looking at the scene photos, there's
13    no trouble believing the officer who testified to the
14    filth and the worst smell he had ever encountered,
15    human excrement all over, three feet high in the
16    bathtub.  Trash and garbage everywhere.  Impossible
17    to lie -- it is impossible to have lied face down in
18    this filth and been punched and not have any sign on
19    your face or clothing.
20              His friend, the male black at the bus
21    stop, knew him for months.  He was stopped by
22    officers after Commander Evans ordered that over the
23    radio.  He testified he had known Rickey Williams for
24    months, not only did he not have a gun in his hand,
```

```
 1      he did not have a cellphone in his hand.
 2                   Rickey Williams testified Commander
 3      Evans held a taser to his groin.  No officer ever
 4      testified Commander Evans had a taser.  Conversely,
 5      Sheila Jackson never signed one out to him.
 6      Apparently, there was no picture of Commander Evans
 7      with a taser on the internet.
 8                   This leads us to Rickey Williams'
 9      eagerness to change his testimony at anyone's request
10      to accommodate the evidence.  Rickey Williams --
11      Commander Evans did wear glasses according to Rickey
12      Williams.  Then he saw a picture on the internet of
13      Commander Evans, and he had glasses on -- he had no
14      glasses on.  Excuse me.
15                   Rickey Williams immediately called
16      IPRA and asked if they wanted him to change his
17      testimony.  Do you want me to say the officer had no
18      glasses?
19                   Rickey Williams told IPRA time and
20      time again, typed and taped statements, from the day
21      after, the gun was in the left hand.  Commander Evans
22      held the gun in his left hand.
23                   In May of 2015, an Assistant State's
24      Attorney told him Commander Evans wore his holster on
```

```
 1    the left, did he want to change his testimony.  All
 2    of a sudden, yes, the hand -- yes, it was in his
 3    right hand.
 4                   This fact was so important that
 5    Commander Klimas and IPRA Chief Ando requested
 6    immediately in February that this be cleared up.  It
 7    goes without saying, this is important.  It should be
 8    looked into.
 9                   There were memos as to whether or
10    not -- to find out whether Commander Evans was right
11    handed or left handed out there for a year and a
12    half, memos that went to five or six other members of
13    IPRA.  It's not a problem for Rickey Williams two and
14    a half years later, he can switch the hand.
15                   The State argued the DNA proves guilt
16    in this case.  The DNA puts Commander Evans at the
17    scene, which he did himself when he called for backup
18    on the radio and assisted in the arrest of Rickey
19    Williams.  The request to have the gun swabbed inside
20    and out or front inside and out made the Commander --
21    made by Commander Klimas and Scott Ando,
22    a request that was never received by Evidence
23    Technician Comiskey.  They specifically said, do the
24    front of the gun, inside and out.
```

```
 1                    When Commander Evans voluntarily
 2    turned over his weapon a few days after the arrest,
 3    Rickey Williams -- of Rickey Williams, Evidence
 4    Technician Comiskey wet one swab.  He used -- he
 5    swabbed the entire weapon.  Back to front, up, down,
 6    the same swab, outside only.  He then dried it with
 7    another swab.  Both swabs were then placed in the
 8    same small envelope and inventoried.
 9                    Commander Evans' holster was not
10    swabbed, and he did not have a taser with him when he
11    went into the police station on duty -- or
12    headquarters on duty.
13                    The Illinois State Police Crime Lab
14    analyst made a decision not to test for saliva, and
15    Vincent Jones from IPRA gave permission to consume to
16    the analyst without knowing what that meant.
17                    The fact that Rickey Williams' DNA
18    was on the swab is of fleeting relevance or
19    significance because it is touch DNA, and as the
20    expert testified, DNA can move, it can spread, it
21    need not be in direct contact with an object to get a
22    finding.  And in this case, the end of the gun and
23    the inside of the gun were not swabbed separately.
24    In fact, the inside of the gun was never swabbed at
```

1    all.

2    Commander Evans had enough lawful
3    conduct with Rickey Evans to explain why his DNA was
4    on Commander Evans' gun. He was attempting -- in
5    attempting to handcuff Rickey Williams, two officers
6    were needed. There was tussling with his hands, his
7    gun was out, or at the very least, his touch on his
8    gun -- he touched his gun after he touched Rickey
9    Williams.

10    The size of the defendant, the
11    victim, and the witnesses are more physical evidence.
12    In this case, the two officers, three to four times
13    his size in height and weight -- in weight and
14    slightly taller, were pounding him from above. They
15    would leave bruises, a broken bone, a cracked rib
16    if their weight was on Rickey Williams as he
17    described.

18    He complained to no one. He never
19    sought medical treatment for anything. Rickey
20    Williams is not unbelievable because he is a two-time
21    convicted felon. His testimony was, as our Supreme
22    Court stated in *People versus Coulsin*, unreasonable,
23    improbable, and contrary to human experience.
24    My ruling does not pertain to

1  misconduct committed by law enforcement throughout
2  the city and country, nor does it pertain to the
3  victims of brutality at the hands of law enforcement.
4  It is made with regard to the allegations by Rickey
5  Williams against Commander Glenn Evans and,
6  hopefully, the other officers wrongly implicated in
7  this case.
8              There will be a finding of not guilty
9  as to all charges.  The defendant is discharged from
10 this case.
11                  (Which were all the proceedings
12                  had in the above matter.)
13
14
15
16
17
18
19
20
21
22
23
24

1   STATE OF ILLINOIS     )
2                         ) SS:
3   COUNTY OF C O O K     )
4           I, JO ANN KROLICKI, an Official Shorthand
5   Reporter for the Circuit Court of Cook County, County
6   Department, Criminal Division, do hereby certify that
7   I reported in shorthand the proceedings had in the
8   above-entitled cause, and that the foregoing is a
9   true and correct transcript of my shorthand notes so
10  taken before Judge Diane Gordon Cannon on December
11  14, 2015.

        JO ANN KROLICKI, CSR, RPR
        OFFICIAL COURT REPORTER
        ILLINOIS LICENSE NO. 084-002215